R.M.P. HOLDING CO. AND BARTO, PLAINTIFFS, v. CITY
OF PASSAIC, DEFENDANT.

Tax Court of New Jersey

May 29, 1980.

*Todd M. Sahner* for plaintiffs (*Hannoch, Weisman, Stern, Besser, Berkowitz & Kinney*, P. A.).

*John J. McKniff,* City Counsel, for defendant (*Joseph A. Pojanowski, III*, City Attorney.).

CRABTREE, J. T. C.

This is a local property tax case wherein the plaintiffs seek review of judgments of the Passaic County Board of Taxation (County Board) reducing the assessments with respect to property located at 67–73 Hoover Avenue, Passaic, New Jersey (Block 4124, Lot 14) and 212–214 Madison Street, Passaic, New Jersey (Block 4124, Lot 24) for the tax years 1975 through 1978. The defendant counterclaims, seeking restoration of the original assessments. The assessments and the County Board action thereon were as follows:

Block 4124
Lot 14
1975–1978

|  | Assessment | County Board Judgment |
|---|---|---|
| Land | $ 27,000 | $27,000 |
| Improvements | 73,000 | 60,000 |
| Total | $100,000 | $87,000 |

Block 4124
Lot 24
1975

|  | Assessment | County Board Judgment |
|---|---|---|
| Land | $ 39,600 | $ 39,600 |
| Improvements | 85,400 | 74,400 |
| Total | $125,000 | $114,000 |

|              | 1976–1978 Assessment | County Board Judgment |
|--------------|----------------------|-----------------------|
| Land         | $ 39,600             | $ 39,600              |
| Improvements | 86,900               | 75,900                |
| Total        | $126,500             | $115,500              |

Separate petitions were filed, one for each separately assessed parcel. The plaintiffs' expert aggregated them for appraisal purposes and the cases embraced by the petitions were consolidated for trial, briefs and decision. The parcels will be considered together throughout this opinion, but the fair assessable values will be stated for each lot at the conclusion.

The two lots in question are contiguous and they form a single economic unit. The land consists of 25,248 square feet and the improvements thereon constructed total 40,278 square feet. Lot 24 contains a 2–story and basement masonry commercial building constructed in 1929. Lot 14 contains a one, two, three, and four story and partial basement masonry commercial building erected in 1948. Both buildings were in fair condition on the applicable assessing dates.

Prior to August 1974 the property was leased to Sears, Roebuck & Co. and devoted to commercial use as a retail store. The tenant vacated the premises in August 1974 and the property remained vacant thereafter until it was sold in July 1975 to Edgar and Armand Bartolucci, partners trading as Barto who occupied the property and converted it to light industrial use. The premises were not leased during any of the tax years in issue.

The selling price in July 1975 was $160,000, which represented the entire consideration involved in the sale. The seller took back a purchase money mortgage for $135,000 at 8¼% per annum, due August 1, 1990.

At issue are the true value of the subject property and whether the assessments were discriminatory.

Plaintiffs' expert determined the true value of the property to be $160,000 for all tax years under review. He relied principally upon the July 16, 1975 sale of the property from R.M.P. Holding Company to Barto, a sale which he was satisfied was an arms'–length transaction. I find, from the credible testimony of both the expert and one of the principals of the seller, that the sale was indeed an arms'–length transaction. The property was exposed for sale upon the open market through a number of brokers for almost a year before Barto's offer of $160,000 in January 1975. That offer was substantially higher than any prior offers and was conditioned upon the seller's acceptance of a purchase money mortgage of $135,000 and the granting of a use variance to be applied for by the seller.

Plaintiffs' expert also found support for his true value conclusion by use of the economic approach. He calculated the gross rent potential by reference to the square foot rental produced by the neighboring property at 216 Madison Street, which he found comparable to the subject property for economic rent purposes after appropriate adjustments for size, time, depth, space, location and vacancy. He estimated effective gross income as $31,109. Expenses were stabilized for all tax years at $7,923, resulting in an imputed net income of $23,186. The expert then applied the building residual method, attributing $8,738 of net income to the land for 1975, 1976 and 1977 and $8,984 of net income to the land for 1978. His capitalization rate for the years 1975–1977 consisted of a 9% interest rate, a 3% recapture rate, and an effective tax rate of 4.12% for a total rate of 16.12%. His capitalization rate for 1978 was composed of a 9.5% interest rate, a 3% recapture rate and an effective tax rate of 3.99% for a total rate of 16.49%. The defendant's land assessment was accepted as the true value for all years.

The expert indicated that his basis for the return and recapture rates was an analysis of comparable risk factors and long term investments. He testified that he arrived at his rates of

return upon the basis of (1) such investments (2) his knowledge of the short and long term money markets and (3) his estimate that the downtown business area of Passaic was an area of lesser investment desirability and greater risk than many of the comparable long term investments upon which he relied.

Plaintiffs' expert capitalized income pursuant to aforementioned rates to arrive at a true value of $156,000 for the years 1975 through 1977 and $152,700 for 1978.

The expert also found support for his true value determination in 3 arms'–length sales of comparable properties, all located within one block of the subject, occurring during the tax years in issue. These sales all took place after the sale of the subject and at a lower sales price per square foot. The expert stated that these sales not only supported his value for the subject property but also reflected a decline in commercial property values in Passaic throughout the tax years under review.

Finally, plaintiffs' expert rejected the reproduction cost approach as a valuation method because, he averred, such approach would merely have mirrored the income and market data approaches if properly used.

The defendant's expert, its Chief Assessor, found the true value of the subject property to be $255,000 and relied principally on the reproduction cost and income approaches to valuation. In his income approach he postulated gross rent potential of $39,217, using the same square foot rental assumptions as the plaintiffs' expert with the exception of the first floor, which he calculated at $2 per square foot compared to the $1.60 per square foot utilized by the plaintiffs' expert. The Assessor applied a 5% vacancy and collection loss factor to his gross rent potential to arrive at effective gross income of $37,257. His deduction of the same expenses claimed by the plaintiffs produced imputable net income of $31,107 to which he applied a total capitalization rate of 12.4% for all years in issue. That rate was allocated on the basis of 7.5% return, 0.8% recapture and 4.1% effective tax rate. Using the building residual method, the Assessor allocated $7,792 to land income, capitalizing the residu-

al income at 12.4% to arrive at a true value of the building. This exercise produced a total value for land and building of $255,000, an amount exceeding the assessments for all years.

While the selling price of real property involved in a judicial determination of its assessable value is a "guiding indicium" of fair value and ordinarily is merely evidential, such price under certain circumstances might become controlling. *Hackensack Water Co. v. Div. of Tax Appeals*, 2 *N.J.* 157, 162, 65 *A.2d* 828 (1949). The statutory criterion is the consideration of the market value at a fair and bona fide sale by private contract. *N.J.S.A.* 54:4–23. I find that the price for which the subject premises were sold on July 16, 1975 is, under all the facts of this case, the best evidence of the property's true value and I find that price to be controlling in this proceeding. In reaching this conclusion I have weighed and evaluated the factors surrounding the sale and I find no special circumstances tending to increase or depress the sales price in derogation of the property's true value. See *Rek Investment Co. v. Newark*, 80 *N.J.Super.* 552, 559, 194 *A.2d* 368 (App.Div.1963); *McCrory Stores Corp. v. Asbury Park*, 89 *N.J.Super.* 234, 245, 214 *A.2d* 526 (App.Div. 1965). The credible evidence reveals that the premises were exposed for sale on the open market through several brokers for almost a year and that the selling price was not only substantially in excess of any prior offers but was burdened with two significant conditions: long–term financing by the seller and a use variance.

The conclusion that the selling price of $160,000 was the optimum amount obtainable on the open market (and the best evidence of true value) finds persuasive support in the economic approach to valuation utilized by the plaintiffs' expert. His capitalization of imputed net income produced values of $156,000 for tax years 1975–1977 and $152,700 for 1978, deviations of less than 5% from the selling price. I find the risk–oriented components of the expert's capitalization rate reasonable and I accept them as an accurate reflection of the demands of the long–term investment market during the tax years under review. I give

great weight to the opinion of the plaintiffs' expert, as I am impressed not only with his candor, intelligence, knowledge and experience but also with the facts and reasoning which form the foundation of his opinion. *In re Port of New York Authority,* 28 *N.J.Super.* 575, 101 *A.2d* 365 (App.Div.1953); *Passaic v. Gera Mills,* 55 *N.J.Super.* 73, 150 *A.2d* 67 (App.Div.1959), certif. denied 30 *N.J.* 153, 152 *A.2d* 171 (1959).

The testimony of the defendant's expert, on the other hand, does not withstand close scrutiny. To begin with, his determination of economic rent finds no support in the record. His assumption of a $2 per square foot rental for the first floor of the subject property is discredited by his concession that he was unaware that the adjacent building was generating only $1.60 per square foot and his inability to name any property located on the same street as the subject property that generated any rent greater than $1.60 per square foot.

In addition, the Assessor, while he claimed to utilize plaintiffs' expense estimates, seemed unaware of the fact that two of those expense items were calculated as a percentage of gross income. Thus, he failed to reflect the increase in expenses necessarily resulting from an increase in gross income.

The major flaw in the Assessor's analysis, however, lies with the development of his capitalization rate. His assumed return on investment of 7.5% is supported only by reference to the prevailing yield on short–term, low–risk investments. He made no effort to compare his return rate to yields on long term investments prevalent during the tax years, even though he admitted that a real estate investor would consider the subject property a long term investment and that investors would require a higher return on Passaic real estate during the years in question because of the risk associated with ownership of Passaic property.

Finally, the Assessor's selection of a recapture component of 0.8% is predicated upon a sinking fund approach, which is demonstrably inappropriate for the subject property. The use of Hoskold or a sinking fund method presupposes the projection

of a stable income level over the remaining economic life of the improvement, *i. e.*, the property is occupied by a high–grade tenant under a long–term lease. American Institute of Real Estate Appraisers, *The Appraisal of Real Estate*, 317–318 (7th Ed. 1978). This supposition finds no support in the record. The subject property was either vacant or owner–occupied throughout all the years under review. The proposition that the property should be valued as though it were demised to a high–grade tenant for a long period of time is a tenuous, unwarranted hypothesis.

In view of the foregoing I find the true value of the subject property for all years under review to be $160,000.

## DISCRIMINATION

### A.   1975–1977

Plaintiffs' expert presented an analysis of the statistical data compiled and published by the State Director of the Division of Taxation (the Director). This information indicated that the overall average ratios [1] for the City of Passaic for the years 1975 through 1977 were:

| | |
|---|---|
| 1975 | 77.73% |
| 1976 | 75.34% |
| 1977 | 77.15% |

During the years 1975 through 1977, the ratios for Class 2 (1–4 family residential houses) and Class 4 (apartments, commercial, and industrial) properties were:

| | Class 2 | Class 4 |
|---|---|---|
| 1976 | 59.16% | 89.49% |
| 1976 | 58.22% | 90.28% |
| 1977 | 56.79% | 99.94% |

The Director's studies for the 3 years in question also indicate the following with respect to ratio ranges and clusters:

---

[1] The ratio of assessed values to market values, determined by usable sales.

## CLUSTERS BY CLASS

| Ratio | 1975 Sales [2] | | 1976 Sales [2] | | 1977 Sales [2] | |
|---|---|---|---|---|---|---|
| | Class 2 – 4 | | Class 2 – 4 | | Class 2 – 4 | |
| 100% and over | 10 | 17 | 12 | 19 | 6 | 29 |
| 90 – 99 | 9 | 5 | 5 | 3 | 8 | 5 |
| 80 – 89 | 8 | 8 | 5 | 9 | 7 | 6 |
| 70 – 79 | 15 | 16 | 14 | 11 | 20 | 8 |
| 60 – 69 | 30 | 3 | 36 | 6 | 31 | 7 |
| 50 – 59 | 65 | 3 | 44 | 2 | 71 | 2 |
| 40 – 49 | 36 | 1 | 49 | 0 | 47 | 1 |
| 30 – 39 | 6 | 0 | 1 | 0 | 11 | 0 |
| No sales below 30 | — | — | — | — | — | — |
| | 179 | 53 | 166 | 50 | 201 | 58 |

## ALL CLASSES

| | 1975 | 1976 | 1977 |
|---|---|---|---|
| 100% and over | 27 | 32 | 37 |
| 90 – 99 | 14 | 8 | 13 |
| 80 – 89 | 17 | 14 | 13 |
| 70 – 79 | 32 | 25 | 28 |
| 60 – 69 | 33 | 42 | 40 |
| 50 – 59 | 68 | 46 | 73 |
| 40 – 49 | 37 | 49 | 48 |
| 30 – 39 | 6 | 1 | 11 |
| No sales under 30 | — | — | — |
| | 234 | 217 | 263 |

[2]Sales of Class 1 (vacant land) properties were too few in number to be statistically significant.

The Director's published coefficients of deviation [3] for the years 1975 through 1977 indicated the following with respect to Passaic:

### General Coefficients

| | |
|---|---|
| 1975 | 27.83% |
| 1976 | 31.33% |
| 1977 | 34.58% |

### Segmented Coefficients for Class 4 Properties

| | |
|---|---|
| 1975 | 39.46% |
| 1976 | 41.78% |
| 1977 | 53.37% |

### Range of Ratios (Low and High) by Classification

| | Class 2 | Class 4 |
|---|---|---|
| 1975 | 35.82–142.00 | 44.86–174.63 |
| 1976 | 39.33–212.50 | 53.78–260.00 |
| 1977 | 30.77–516.67 | 45.14–232.00 |

The subject property is included in Class 4.

The Assessor's assessing practices can only be described as random and inconsistent. He acknowledged that he changed assessments for properties that were sold, for properties for which building permits were sought and for properties that were otherwise called to his attention. He did not alter assessments for properties which fell into none of these categories. There was no consistently applied standard for increasing assessments. In some cases, the Assessor increased the assessment to the sales

---

[3]Coefficients of deviation are useful statistical tools in the measurement of uniformity of assessment practices. A high coefficient denotes lack of uniformity, whereas a low coefficient signifies reasonable equality of assessment. The general coefficient is the average deviation from the average assessment ratio in the taxing district, expressed as a percentage of average assessment ratio. The segmented coefficient is the average deviation of assessment ratios of each property class from the average assessment for all properties of all classes expressed as a percentage of average assessment ratios for all properties of all classes.

price, while in other instances he calculated the assessment by applying the average ratio to the selling price. He also conceded that he would not lower an assessment on his own initiative when a property sold for less than its assessed value. In the absence of some inquiry or overture from the buyer, the assessment of such property was not disturbed.

It is now well settled in this State that "a taxpayer is entitled to 'treatment commensurate with that given his fellow taxpayers within the municipality' and that if it is not accorded, he is entitled to a judicial or quasi–judicial remedy." *Tri–Terminal Corp. v. Edgewater*, 68 *N.J.* 405, 409, 346 *A.2d* 396, 399 (1975). Where a taxpayer's property is assessed at a ratio to true value substantially higher than the common level of assessments, or, if there is no such common level, substantially higher than the average ratio determined by the Director, then such taxpayer is ordinarily entitled to a reduction of his assessment down to the valuation resulting from application of the Director's ratio to the true value of the property. *In re Appeal of Kents, 2124 Atlantic Ave., Inc.*, 34 *N.J.* 21, 166 *A.2d* 763 (1961).

The evidence in this case leads inescapably to the conclusion–and I so find–that no common level existed in the City of Passaic during the years 1975 through 1977. The Assessor's own testimony belies his assertion that he endeavored to maintain a common level of assessments.

Quite apart from the Assessor's testimony, the Director's sales ratio and coefficients of deviation studies point to random, chaotic assessing practices which reveal planlessness and the absence of any semblance of a common level. The ranges of ratios for Class 2 and Class 4 properties during the years 1975 through 1977 were extraordinarily broad, with a spread of more than 100 percentage points for each year in question. The ratio clusters do not indicate concentration within a relatively narrow band. Indeed, a band of 50 percentage points is required to cover 80% of sales of all classes in 1975 and 1976 and the same band is required to cover 78% of sales in 1977.

■ The coefficients of deviation, excellent statistical barometers employed in determining uniformity (or the lack thereof) in assessing practices, reinforce the conclusion of planlessness drawn from an analysis of the ratio ranges and clusters. The general coefficients of deviation ranged from 27.83% in 1975 to 34.58% in 1977. The segmented coefficients of deviation for Class 4 properties were even worse, ranging from 39.46% in 1975 to 53.37% in 1977. A coefficient of deviation in excess of 20% indicates the absence of a common level (or the erosion of a pre–existing one) and the need for a revaluation. *Tri–Terminal Corp. v. Edgewater, supra,* 68 *N.J.* at 413, 346 *A.2d* 396.

■ Discrimination is shown by the ratio between the assessed value of the subject property and its true value, as herein determined. That ratio is 140%, substantially in excess of the Director's average ratios of 77.73%, 75.34% and 77.15% for the years 1975, 1976 and 1977, respectively.

In view of the foregoing I find that the plaintiffs are entitled to discrimination relief for the years 1975, 1976 and 1977 and that the assessable value of the subject property shall be the true value thereof, as hereinabove determined, to which I will apply, in the interest of relative stability in assessments, the average of the Director's average ratios for the 3 years in question. *New Brunswick v. Division of Tax Appeals,* 39 *N.J.* 537, 189 *A.2d* 702 (1963); *Feder v. Passaic,* 105 *N.J.Super.* 157, 251 *A.2d* 457 (1969). That figure is 76.74%.

### B. 1978

■ Discrimination relief from the assessments on the subject property is appropriate for 1978. *N.J.S.A.* 54:2–40.4, effective for 1978, provides in pertinent part:

"Whenever the (Tax Court) is satisfied by the proofs that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall revise the taxable value of the property by applying the average ratio to the true value of the property . . ."

The "common level range", as defined in *N.J.S.A.* 54:1–35a, is "that range which is plus or minus 15% of the average ratio for

that district." The average ratio is defined in the same statute (for 1978) as the "unweighted, unclassified, arithmetic average as determined by the Director of the Division of Taxation from the latest 1–year study data compiled by the director . . . as of October 1 of the year preceding the tax year . . ." *N.J.S.A.* 54:1–35b instructs the Director, on or before April 1 in each year, to determine the average ratio and the common level range and to certify the same to the county boards, the assessors, and the municipal clerks. The average ratio so certified by the Director for Passaic is 74% and the common level range, also certified, is 63% (lower) and 86% (upper).

The defendant argues that the average ratio is 80.51% for 1978, as that is the figure which appears in the Table of Equalized Valuations promulgated by the Director pursuant to *N.J.S.A.* 54:1–35.1 for school aid purposes. This argument overlooks the fact that the latter Table is weighted. See *Tp. of Willingboro v. Burlington County Board of Taxation*, 62 *N.J.* 203, 212, 300 *A.*2d 129 (1973). *N.J.S.A.* 54:1–35a, prior to its amendment for 1979 and later years, defined the average ratio in terms of the *unweighted*, unclassified arithmetic average as determined by the Director. This unweighted figure, reflected in the Director's certification, is, as stated earlier, 74% for 1978.

As the subject property was assessed at 140% of its true value, which I have found to be $160,000 for all tax years in issue, I find that the assessments lie beyond the common level range and, accordingly, the assessments will be reduced for 1978 to the property's true value multiplied by the average ratio of 74% pursuant to *N.J.S.A.* 54:2–40.4.

In view of the foregoing judgment will be entered determining the assessments to be as follows:

|              | 1975, 1976, 1977 |                |
| ------------ | :--------------: | :------------: |
|              | Block 4124 Lot 24 | Block 4124 Lot 14 |
| Land         | $30,390          | $20,720        |
| Improvements | 37,140           | 34,530         |
| Totals       | $67,530          | $55,250        |

|              |     1978     |                |
| ------------ | :----------: | :------------: |
|              | Block 4124 Lot 24 | Block 4124 Lot 14 |
| Land         | $29,304      | $20,000        |
| Improvements | 35,816       | 33,300         |
| Totals       | $65,120      | $53,300        |