TOWN OF KEARNY, A MUNICIPAL CORPORATION, PLAIN-
TIFF-APPELLANT, v. DIVISION OF TAX APPEALS IN
THE DEPARTMENT OF THE TREASURY OF THE STATE
OF NEW JERSEY AND DIRECTOR OF THE DIVISION
OF TAXATION IN THE DEPARTMENT OF THE TREAS-
URY OF THE STATE OF NEW JERSEY, DEFENDANTS-
RESPONDENTS.

TOWN OF KEARNY, A MUNICIPAL CORPORATION, PLAIN-
TIFF-APPELLANT, v. DIVISION OF TAX APPEALS IN
THE DEPARTMENT OF THE TREASURY OF THE
STATE OF NEW JERSEY AND THE HUDSON COUNTY
BOARD OF TAXATION, DEFENDANTS-RESPONDENTS.

Argued May 23, 1961—Decided June 30, 1961.

300

*Mr. Robert J. McCurrie* argued the cause for plaintiff-appellant.

*Mr. Theodore I. Botter,* Assistant Attorney General, argued the cause for defendants-respondents (*Mr. David D. Furman,* Attorney General of New Jersey, attorney).

The opinion of the court was delivered by

FRANCIS, J. The Equalization Table promulgated by the Director of the Division of Taxation on October 1, 1959, under *N. J. S. A.* 54:1–35.1, fixed the average ratio of assessed value to true value of real property in the Town of Kearny at 33.87%. As the result of additional information submitted by Kearny, it was increased to 34.81% and the latter ratio was used as the basis for distribution of the 1960 state school aid to Kearny pursuant to *N. J. S. A.* 18:10–29.33. The mode of establishing this table and the nature and effect of its use have been fully explained and discussed in a number of cases in the Appellate Division and Supreme Court. See, *e. g., In re Appeal of Kents 2124 Atlantic Ave., Inc.,* 34 *N. J.* 21, 26–27 (1961); *City of Passaic v. Passaic County Board of Taxation,* 27 *N. J.* 467 (1958); *City of Passaic v. Passaic County Board of Taxation,* 18 *N. J.* 371 (1955); *City of Bayonne v. Division of Tax Appeals,* 49 *N. J. Super.* 230 (*App. Div.* 1958); *Borough of Carteret v. Division of Tax Appeals,* 40 *N. J. Super.* 439 (*App. Div.* 1956), certification denied *Borough of Sayreville v. Division of Tax Appeals,* 22 *N. J.* 224 (1956).

The Hudson County Tax Board was under an independent duty to establish a county equalization table for the purpose of apportioning the county tax burden for 1960 among the municipalities of the County. *N. J. S. A.* 54:3–17. In

the discharge of that task, the Board as a matter of course adopted the ratio of assessed to true value of real property in Kearny as it appeared in the Director's Table.

In constructing the Table so far as it related to the ratio of assessment to true value in Kearny, the Director declined (for reasons to be discussed) to utilize three sales of property in that municipality, which occurred during the two years covered by his study and computations. These sales, if included, would have raised the ratio to 46.31%. The effect of the failure was to decrease Kearny's allotment of school aid by $26,326. It is conceded also that use by the Hudson County Tax Board of the Director's ratio imposed on the town an additional county tax burden in excess of $600,000.

To rectify the alleged unequal school aid treatment, Kearny sought a review of the Director's Equalization Table in the State Division of Tax Appeals. See *N. J. S. A.* 54:1–35.4. The Division held that the proof submitted was not sufficient to overcome the statutory presumption of correctness. The Appellate Division affirmed, saying among other things:

"* * * But a municipality may not accept the Director's formula (*i. e.*, relation between sales price and assessment), and his use of all but two or three sales, and then by proving the circumstances relating to those two or three sales force the Director in those cases to abandon the formula for the truth. The Director may do so, but he is not compelled to do so; and, in the case at bar, we perceive no abuse of discretion in the rejection of Kearny's position." 61 *N. J. Super.* 438, 444 (*App. Div.* 1960).

We granted certification. 33 *N. J.* 326 (1960).

In order to attack the allegedly excessive county tax burden it was necessary to challenge the County Equalization Table before the County Tax Board. *N. J. S. A.* 54:2–37. Kearny did so, but was denied relief, the Board indicating that its practice was to adopt routinely the Director's ratio for school aid purposes as its own Equalization Table in allocating the county tax burden among the municipalities. The State Division affirmed and an appeal was taken to the

Appellate Division. We granted certification in order to consider the problem along with the appeal already before us.

The need for an equalization table and for a determination of the ratio of assessment to true value for school aid and county tax distribution stems from the failure of local assessors to assess property in their municipalities at true value or at a uniform percentage thereof uniformly applied by all municipalities. In preparing the table, the Director of the Division of Taxation follows a convenient and uncomplicated system. All sales of real estate in each municipality of the State during the year being studied are reported to him. The sale price as indicated by the revenue stamps on the deed is treated as representing true value. The ratio of assessment to true value is then determined by comparison between the sales price and the assessed value. The process is further refined by classifying the sales into four categories: (1) vacant land; (2) residential; (3) farm; (4) "other" (which includes commercial, industrial, apartments, etc.). An overall average ratio is calculated (by means which need not be further detailed here, see *In re Appeal of Kents 2124 Atlantic Ave., Inc., supra; City of Bayonne v. Division of Tax Appeals, supra;* N. J. S. A. 54:1–35.2, 3) which, by application to the total assessed value of real property in the municipality under study, as reported by its assessor, produces the aggregate equalized (hypothetically the true) value of such property. This total figure provides the basis for allocation of state school aid to each municipality, N. J. S. A. 18:10–29.33, and (when and if adopted by the County Tax Board) for distribution of the county tax burden among the municipalities. No one suggests that the aggregate true value of real property ratables reached by such means actually or accurately represents true market value. *Borough of Carteret v. Division of Tax Appeals, supra,* 40 N. J. Super., at *pp.* 446, 447. The Director's formula produces a practical, work-a-day equitable result which will have to serve the intermunicipal public purposes involved as a basic guide

until all assessors either assess at full true value or at a uniform percentage thereof.

█ The average ratio shown in the Director's table is not conclusive upon the particular municipality to which it relates. In connection with its use for school aid distribution, the Legislature has made specific provision for review thereof in the Division of Tax Appeals. *N. J. S. A.* 54:1–35.4. Obviously, if the Director improperly omitted some significant sales occurring in the period covered, which substantially affected the applicable ratio, the Division would be duty bound to correct the error. Of course the burden of proof on the municipality in such situation is a heavy one. The Director is and must be vested with wide discretion in fashioning the table. The statute envelops his work with a presumption of correctness vital enough to sustain it unless "upon all the evidence available [the challenged ratio] could not reasonably be justified." (Insertion ours)

█ The Director does not promulgate his equalization table to control distribution of the county tax burden. The obligation to equalize assessments to that end rests with the County Tax Board. *N. J. S. A.* 54:3–17. Because the same method of determining the average ratios would probably be followed, as a matter of practice the Director's table is ordinarily accepted by the Board as *prima facie* correct and consequently usable in the achievement of its statutory aim. See *City of Passaic v. Passaic County Board of Taxation,* 18 *N. J.* 371 (1955). But such a course would not be warranted in the face of adequate evidence offered by a complaining municipality to demonstrate that the ratio ascribed to it is incorrect or plainly unjust. In that event, the Board would not be fulfilling the statutory mandate to "ascertain and determine according to its best knowledge and information, the general ratio or percentage of true value at which the real property of each taxing district is in fact assessed  *  *  *." *N. J. S. A.* 54:3–17. The comment of this court in *City of Passaic v. Passaic*

*County Board of Taxation,* 27 *N. J.* 467, 472 (1958), is clear on that subject:

"In a word, counsel's point was that the board was bound at all events by the Director's table established in aid of the distribution of state school funds, an untenable hypothesis. In reality, the basic grievance was, and is, the board's readjustment of the ratios to accord with all relevant data as of the statutory assessment date. Yet *this was its peremptory duty under the statute.*" (Emphasis added)

When the Director's table is adopted as the county table it is not conclusive upon the municipalities. It is subject to attack and revision in the County Tax Board before final approval, *N. J. S. A.* 54:3–18, and thereafter may be challenged again in the Division of Tax Appeals. *N. J. S. A.* 54:2–37. Although the specific statutory presumption of correctness of the table appears to be related to school aid apportionment, undoubtedly the ordinary presumption of validity which accompanies a determination of a county tax board would apply on such appeal.

Kearny contends that the Director (and the County Tax Board which accepted his table) erred in refusing to include in the sales employed by him in computing the average ratio of assessment to true value three relevant and substantial sales. The sales are: (1) E. I. duPont deNemours and Company to Carla Holding Company on August 11, 1958, for $9,500; (2) duPont to Wasco Chemical Company, Inc., on September 25, 1958, for $400,000; (3) Congoleum-Nairn, Inc., to Kearnyland, Inc., on January 15, 1959, for $800,000.

The Director does not automatically include in his calculations every sale of land occurring in a municipality during the study period. He has established a list of 27 categories of transactions which are non-usable. In this instance, he rejected the three Kearny sales on the ground that they were "split-offs" within the meaning of category 6. The category provides that:

"Sales of property conveying only a portion of the assessed unit, usually referred to as apportionments, split-offs or cut-offs; for example, a parcel sold out of a larger tract where the assessment is for the larger tract"

shall be excluded. Exclusion of a sale apparently falling into one of the 27 classes is made subject to the following general qualification:

"Transfers of the foregoing nature should generally be excluded but may be used if after full investigation it clearly appears that the transaction was a sale between a willing buyer and a willing seller and that it meets all other requisites of a usable sale."

To decide, therefore, whether the refusal to include the sales in question constituted a mistaken use of discretion by the Director and the County Board, the factual circumstances surrounding them must be explored.

### THE CONGOLEUM-NAIRN INC. TO KEARNYLAND INC. SALE OF JANUARY 15, 1959.

Prior to December 15, 1958, Congoleum-Nairn Inc. owned the following four separately assessed land units in Kearny:

TABLE A.

| Unit # | Block | Lot | Area | Land Assessment | Improvement Assessment | Total |
|--------|-------|-----|------|-----------------|------------------------|-------|
| 1 | 23 | 1 | | $65,000. | $251,500. | $316,500. |
| 2 | 23 | 2 & 3 | | 35,000. | 100,000. | 135,000. |
| 1 | 21 | 7 to 9 | 6.827 acres | 74,900. | 96,200. | 171,100. |
| 2 | 21 | 7A, 8A, 9A | .473 acres | 5,450. | | 5,450. |

On December 15, 1958 Congoleum applied to the town for the subdivision of units designated 1 and 2 of Block 21. The application was approved by the Planning Board on December 18, 1958. The subdivision partitioned the two units in this fashion:

TABLE B.

| Unit # | Block | Lot | Area | Land Assessment | Improvement Assessment | Total |
|--------|-------|-----|------|-----------------|------------------------|-------|
| 1 | 21 | 9C & 9AC | 1.857 acres | $20,450. | $ | $20,450. |
| 2 | 21 | 9B & 9AB 7 to 9B | 5.443 acres | 59,900. | 96,200. | 156,100. |

It should be noted that the total acreage of these units, 7.30 acres, is the same before and after the subdivision; the same is true of total assessment of the lots, $176,550.

When Units 1 and 2 of Block 21 were subdivided, they were reassessed separately but informally in December 1958, lots 9C and 9AC being valued for the purpose at $20,450. According to the Assistant Assessor, he made the reassessment and noted the change in his work book or field book. Through inadvertence or mistake (as the Appellate Division put it) he failed to note the revision on the Assessor's list, *N. J. S. A.* 54:4–24, either in December or down to January 10, 1959, when the completed list had to be filed with the County Tax Board. *N. J. S. A.* 54:4–35.

On January 15, 1959, Congoleum-Nairn sold Units 1 and 2 and the new subdivided Unit 1 to Kearnyland Inc. for $800,000. The total assessment of all the units conveyed amounted to $471,950. The transaction may be shown thus:

TABLE C.

| Unit # | Block | Lot | Land Assessment | Improvement Assessment | Total |
|--------|-------|-----|-----------------|------------------------|-------|
| 1 | 23 | 1 | $65,000. | $251,500. | $316,500. |
| 2 | 23 | 2 & 3 | 35,000. | 100,000. | 135,000. |
| 1 | 21 | 9C & 9AC | 20,450. | | 20,450. |

Total Assessed Value ......... $471,950.

It will be noted that the assessments of Units 1 and 2 of Block 23 in this Table remained as originally assessed. They were not involved in any way in the subdivision. But, as

the Appellate Division observed, on account of the mistake in not recording the subdivision and the change in the assessments of Units 1 and 2 of Block 21 on the Assessor's list prior to filing with the County Tax Board, when the deed to Kearnyland was recorded and the sale abstracted for the Director on the form supplied by him, he did not become aware of the subdivision of those units which resulted in Lots 9C and 9AC and the $20,450 new assessment thereon. His inspection of the Assessor's list revealed Units 1 and 2 of Block 21 as they appear on Table A above as to acreage and assessment. Units 1 and 2 of Block 23, of course, appeared thereon in accordance with their unaltered and unaffected assessment. Despite the fact that the latter two unchanged units represented more than 95% of the total assessed value ($451,500 out of $471,950), the Director considered inclusion of revised Unit 1 of Block 21 in the transaction as giving it the character of a category 6 split-off and therefore not a usable sale in the computation of the average ratio of assessed to true value of real property in Kearny.

Assuming that this sale technically constitutes a split-off, should it have been included as a usable sale? The question must be resolved in the light of the qualification created by the Director himself, *i. e.,* that such split-offs should generally be excluded but may be used if after full investigation the transaction clearly appears to be a sale between a willing buyer and willing seller and meets all other requisites of a usable sale.

There appears to be no doubt that the sale by Congoleum to Kearnyland was *bona fide.* No one questions it. So far as the parties are concerned, it was an arms length transaction and the consideration of $800,000 (against an assessment total of $471,950) as a fair market price, was not challenged. There is no doubt that the lots of Block 21 had been officially subdivided before the sale. Moreover, the evidence supports the conclusion that the assessments had been informally revised and that on the new lots 9C

and 9AC set at $20,450. If this latter assessment had been formally noted on the Assessor's list as filed with the County Tax Board, everyone agrees that the sale could not be classed as a split-off and would have to be used in ascertaining the Kearny ratio. The Director's representative, in his testimony before the Division of Tax Appeals, frankly said that in his investigation report of the matter he commented that if "the Town had kept its tax map in shape and had the assessors revised their assessments, they could have claimed the breakdown in 1959 for use in our study, but they didn't make any change." He conceded also that if the assessors had actually carried the subdivision into the 1959 assessment list "there would have been no problem here at all."

It cannot be denied that the face of the record, i. e., the official Assessor's list on file with the County Tax Board, when examined by the Director's agent, showed the old assessment of Units 1 and 2 of Block 21 and did not reflect the subdivision and new valuations for tax purposes. The Assistant-Assessor's explanation was: "I might say that we are one of the very few taxing districts left that write the books by hand, and, as you know, over that period of time you are up to your neck in work and it was just an error that didn't get on the property record cards and didn't get into the 1959 book." Here it should be recalled that the subdivision approval by the Planning Board took place on December 18, 1958, and that the statute required the completed 1959 Assessor's list to be filed with the County Tax Board by January 10, 1960, just five days before the sale in question.

█ Thus, the official record presented the appearance and not what the owner and the town intended to be the true fact of the assessment situation. Obviously, the Director was justified in accepting the record which *prima facie* represented both appearance and fact. But on learning of the error, did not a fair exercise of discretion require that the burden imposed thereby on the taxpayers of Kearny be rectified? We think so.

As has been said, the Director's table, based as it is on sales during a given two-year period, provides for purposes of state school aid and county tax burden distribution a practical approximation of both the average ratio of assessment to true value and the aggregate true value of all real property ratables in a particular municipality. But the very nature of the formula used in reaching the ratio would seem to call for adjustment or correction when specific facts relating to a sale or sales are revealed to the Director or to the County Tax Board, which facts, when given proper effect, demonstrate that the share of county tax burden imposed on the particular municipality is dramatically or substantially excessive or that the allotment of state school aid to it is dramatically or substantially below its just share. In fact, the record before us shows that the Director's ratios are not regarded as immutable. The ratios of Jersey City, Bayonne and Union City, as shown in the table in question, were changed either by the Division of Tax Appeals or by the County Tax Board. The Jersey City change resulted from the inclusion of a single large sale which the Director had not used in his calculations. These revisions must be considered as normal incidents of a difficult and large undertaking which has not yet achieved perfection.

The Director's task is a heavy one. In a limited time he must examine and evaluate expeditiously, and in the light of his 27 nonusable sales categories, many thousands of property transactions. His operation represents a salutary endeavor in an otherwise blurred assessment procedure. But it does have some inherent limitations which, in the interest of fairness and justice to local taxpayers in occasional specific factual situations, call for adjustment of his formulaic results. Proper exercise of discretion requires just treatment of such cases. This court has recognized that the system has weaknesses along with its utilitarian value, and that the duty of the interested agencies is to minimize so far as possible any unfair results:

"Imperfect as equalization of aggregates of real estate assessments is, the county and state agencies have the duty to administer the equalization of aggregates process as best to secure the fair distribution of the tax burden common to municipalities; * * *." *City of Passaic v. Passaic County Board of Taxation*, 18 *N. J.*, at *p*. 381.

And in discussing the County Tax Board's duty at the equalization hearing, the opinion continued:

"In the discharge of its legislative or *quasi*-legislative function, it is its duty to seek all enlightenment that will help it so far as possible to avoid errors in its ultimate determination of assessment ratios. [Citation omitted.] It therefore receives and should receive any proofs reasonably calculated to assist it in reaching a correct determination of the ratios and the board should not reject such proofs or refuse appropriate evidential weight to them out of an over-sensitive regard for their admissibility under rules of evidence applicable in judicial proceedings." *Id.*, 18 *N. J.*, at *p*. 389.

The statutes and the decisions discussing and interpreting them show plainly that the entire equalization process does not and should not lend itself to rigid technicality and formalism. The legislative and judicial purpose is to secure as far as possible the equal distribution of school aid and of the county tax load among the municipalities. A spirit of fairness and equality must be regarded as an essential ingredient of all applicable administrative rules, not excluding those defining and governing split-offs.

Here the Congoleum-Kearnyland sale was an honest one, the subdivision was honest and accomplished before the sale, the old assessments prior to the partition were continued on the record by mistake, and the new informal assessment was not substituted by mistake. In our judgment, the exercise of discretion which failed to give more weight to the equity than to the technical deficiency must be regarded as mistaken.

Accordingly, the sale should have been treated as a usable one and permitted to influence the determination of Kearny's ratio.

## The duPont Sales.

DuPont owned 25 separately assessed real estate units. Their total assessed value for 1958 was $1,372,350, $209,200 of which was for land and $1,163,150 for improvements. All of the property was offered for sale because duPont was moving from Kearny. All of it was sold in August and September 1958 by the two sales involved in this proceeding.

On August 11, 1958 duPont sold to Carla Holding Company Inc. 11 acres of the property for $9,500. There is no charge that it was not an ordinary arms length transaction. The 11 acres, however, consisted of a strip of vacant land taken from three contiguous assessed units and amounted to about two-thirds of those units. The three original units were assessed at $28,850, of which $24,950 was for land and $900 for improvements; they represented less than 2% of the total assessment and the portion conveyed to Carla represented about 1% of the total.

About six weeks later, on September 26, 1958, the remaining 22 whole units, plus the unsold portion of the three units transferred to Carla, were sold to Wasco Chemical Company, Inc. for $400,000, as confirmed by the revenue stamps on the deed.

The Director received the abstracts of the deeds covering these sales at different times. Thus, on ascertaining that the Carla property was made up of parts of three separately assessed units, he branded the sale a split-off under Category 6 and therefore not usable in the formulation of his equalization table. This was understandable. Manifestly, there was no way of telling from the abstract what effect, if any, the separation of the 11 acres from the original three units might have had upon the purchase price, and there being no separate assessment on record for the 11 acres, no ratio between sale price and assessment could be arrived at.

When the Wasco deed came to his attention and it appeared that the tract conveyed consisted of 22 separately

assessed units and parts of three others so assessed, again he classified the sale as a split-off. The same reason obtained as in the earlier case. The portion of the original three units remaining after the cutting off of the 11 acres not having been assessed separately after the August sale, and there being nothing before him then to show what effect addition of that portion to the 22 units had on the purchase price, there was no basis for calculating the sale-assessment ratio.

It seems important to observe at this point that the conclusion to be drawn from the record is that the Director (or the agent who acted for him) did not have these two deeds before him at the time when he declared the second sale a split-off, or then recall, or even know of, the earlier one, or realize that the two deeds represented disposition of the entire 25 duPont assessed units.

In any event, when Kearny called attention to the fact that the sales were less than two months apart in the same year and disposed of the entire duPont assessed realty, he declined to treat them other than as split-offs. The town's further request to add the purchase prices of the two sales so as to obtain the full market value of the entire 25 units, and then to compare that value with the total assessment of the 25 units so as to compute the ratio, was also rejected.

The effect on the town of the split-off declaration (as to these sales and Congoleum) was severe. Its share of the county tax burden increased in excess of $600,000 and it suffered a loss of $26,326 in school aid. Such an unfavorable impact, as has been indicated above, calls for a careful scrutiny of the action of the Director and of the County Tax Board.

Looking at the two sales separately and without regard to the time element involved, they appear to fall into the split-off category. But under the Director's rules, the inquiry does not end at that point. If investigation shows clearly that in fairness and equity to the municipality involved, and in the interest of a closer approach to inter-

municipal equalization, the transactions should be regarded as ordinary sales and therefore usable in the ratio calculation, exclusion as split-offs cannot be supported as a reasonable exercise of discretion.

A significant circumstance, apparently given no weight by the agencies, is that the sales disposing as they did of all the duPont property occurred within about six weeks of each other *in the same year*—a year whose sales were forming the base for the Director's ratio. If one transaction was completed within the year of the table in question, and the second during the year of the succeeding table, obviously there would be no disagreement with application of the split-off rule to each of them. But occurrence of the two in a single year puts the matter in a different light from the standpoint of achieving a more realistic appraisal of the relation between the aggregate of assessments and the aggregate fair value of the real estate ratables. There should be no difficulty at all at the end of the particular table year, in such cases where all the assessed units are sold, in adding the assessments together, then adding the purchase prices and comparing the total of each to find the ratio between assessment and market value.

It must be kept in mind that sales are divided by the Director into the four classes already mentioned. Both the duPont and Congoleum properties belong in the industrial class, where there are relatively few sales in the course of a given year. For example, in the study for the table under review the Director used 287 Kearny deed transactions. Of these, only six were industrial sales with assessments totaling $153,100. More than 50% of Kearny's total assessments are industrial and the sales show a higher ratio of assessment to true value than appears in the other classes. As a consequence, omission of a substantial industrial sale has a greater impact on the town's overall average ratio.

The paucity of industrial sales has an important bearing on the appraisal of the Director's discretion here. The reason advanced for failure or refusal to combine the two duPont

sales was that the administrative burden would be too great if the many thousands of deed transactions had to be studied and "matched up" so as to remove them from the non-usable category. The Director's representative's testimony is to the effect that "a split-off is a split-off." He said also, "We follow these categories to the best of our ability without prejudices. If it fits, that's it. Now if we are go in and say well, it hurts or helps, then we begin to express personal opinion. In this particular case it fits Category Number 6." Particularizing the basic reason for refusing to consider whether on the merits the sales qualified as usable, the witness said:

"By the Commissioner:
Q. I understand, therefore, that in this case your objection is that the practicalities of the situation in your office preclude you from ascertaining in the first place whether or not property that has been split off from other property could later in the same year be added to another sale and thus create one sale which could be compared with the old assessment.
A. That's right."

But when, at the end of the Director's year, there are only nine industrial sales in a municipality like Kearny, and information is furnished by the municipality showing that three of them, having the surface appearance of split-offs, are not in fact deserving of that description, the administrative problem of checking and then accepting the sales as usable in fixing the fair ratio does not seem unduly harassing.

The testimony indicates that the Director's agents usually investigate "practically all" industrial sales. When this statement was made in the Division of Tax Appeals, on the Commissioner's inquiry the following appeared:

"Q. So that then you ought to be able to tell at the end of the year whether or not there have been two sales which put together would indicate that the entire property assessed to that owner had been sold. Is that right?
A. There is no doubt about it."

At another point in the course of discussion of the Attorney General's argument that if Kearny's claim were allowed the same course would have to be taken for all other municipalities thereby causing an excessive administrative burden, the Commissioner remarked:

"But Kearny's position is that if this occurred in every other taxing district you should have done the same thing, so I don't think that's a good argument. Kearny wants to know what is the difference actually whether this property was sold in two separate pieces regardless of the percentage of split, since it was all sold within one year? What's the difference whether you consider that, add the two sales together and apply the total assessment of the property sold to the total purchase price? What difference would that be than if it were all sold at once, in the absence of clear proof that the purchase price of the second sale was materially affected by the purchase price in the first? And even if it were, what difference does that make? It's still a total purchase price, isn't it, if this were one sale?"

In our judgment that comment was sound and leads to the result we deem to be just in the case. Apparently, however, the Commissioner was persuaded ultimately that the matter should be left to the discretion of the Director.

On analysis we find ourselves unable to agree that too great an administrative burden would be cast on the Director if he were to give consideration to influential sales like these two of duPont and to recognize them as usable and not split-offs when they are called to his attention before his table is completed and promulgated. Moreover, when the County Board is formulating its equalization table the task is even less onerous because that Board starts out with the Director's table and a record of all sales occurring in each municipality in the pertinent period. It is not a difficult task to evaluate a few sales in the industrial class on the complaint of the municipality that it was improper to regard them as split-offs. The *City of Passaic* case, *supra,* clearly requires consideration of the facts adduced to demonstrate the error. Under all the facts and circumstances, we conclude that the Director mistakenly used his discretion in

barring these two sales as split-offs, and that the County Tax Board, the Division of Tax Appeals, and the Appellate Division erred in affirming his action on the theory that the Town's proof had not overcome the statutory presumption of correctness of the ratio assigned to it.

As appears earlier in this opinion, two appeals to the Division of Tax Appeals are before us. The first attacked the Kearny ratio as it affected the allocation of school aid. The second was an appeal from the County Tax Board's automatic acceptance of the Director's table as the basis for distribution of the county tax burden, and from its refusal to accept the Congoleum and duPont transactions as usable sales in determining Kearny's average assessment ratio. In the first appeal the only question raised was whether the three sales constituted split-offs. Only that issue was considered by the Division of Tax Appeals and the Appellate Division. In the county tax distribution appeal, the Attorney General presented an additional issue before the Division of Tax Appeals. It was whether the two duPont sales were non-usable transactions because they fell into Category 23. That rule banned:

"Sales of commercial or industrial real property which include machinery, fixtures, equipment, inventories, good will when the values of such items are indeterminable."

It was urged also that the sales were a package transaction involving, in addition to machinery and inventory, acquisition by the buyer Wasco of the corporate stock of Selastics Corporation, a duPont subsidiary. It is true that the duPont-Wasco contract concerned three elements, the real estate referred to herein, machinery and inventory, and stock of Selastics Corporation. The proof shows, however, that the total purchase price was $1,000,000, and allocated in this wise: $400,000 for the real estate, $200,000 for the machinery and inventory, and $400,000 for the stock of Selastics. Kearny offered substantial testimony to establish that

$400,000 was a fair market price for the real estate and the revenue stamps on the deed indicated that sale price.

There is nothing in the record to show that this additional ground presented by the Attorney General on the second appeal to the Division of Tax Appeals was ever considered by the Director. It was not advanced by the Director's witnesses on the school aid appeal, either to the Division of Tax Appeals or to the Appellate Division. Nor was it dealt with at all by the County Tax Board in promulgating its equalization table for county tax distribution purposes. The opinion of the Division of Tax Appeals sustaining the County Board in the second case was predicated upon its earlier holding in the school aid appeal. A sentence was added saying that evidence had been offered showing that the Director could have excluded the duPont sales on a ground in addition to the one on which he relied "*i. e.*, that it was a split-off." Presumably the reference was to the evidence about the so-called package deal which, so far as the record shows, was not before the Director but, as we have said, was offered for the first time on this second appeal.

In view of our holding that these duPont sales should not be deemed split-offs, but should be combined for the purpose of obtaining the ratio of total assessments to total purchase price, we feel that the parties should have the opportunity to explore fully before the Division of Tax Appeals the matter of the alleged package deal and to obtain a finding and ruling with respect to it. Further, since the entire matter is affected with the public interest and since the appeals were consolidated for decision by this court, in our opinion the remand to that Division should not be limited to the issue as it affects Kearny's proper share of the county tax burden. The problem is basically the same in the school aid distribution case and any finding on the merits as to whether the challenged sale is a usable one ought to control both causes. If $400,000 was not actually considered by the parties as the purchase price of the real estate covered by the sale, or if that sum did not constitute

a fair market price between a willing buyer not obliged to buy and a willing seller not obliged to sell, then a finding barring it as a usable sale would be justified.

All that we have said, therefore, leads to the following conclusions:

(1) The Congoleum-Kearnyland Inc. and the duPont sales should not have been regarded as split-offs and treated as not usable for that reason;

(2) The Kearny ratio should be revised so as to reflect the Congoleum-Kearnyland Inc. sale, and the revised ratio should be used in fixing Kearny's just share of state school aid and county tax burden;

(3) The judgments are reversed and both causes are remanded to the Division of Tax Appeals for full hearing and determination whether the $400,000 sum was in fact considered by duPont and Wasco as the fair purchase price of the real estate encompassed by the deed between the one as an owner willing but not compelled to sell, and the other as a buyer willing but not compelled to buy. If the proof does not establish such a transaction, then both duPont sales should be excluded as factors in the allocation of Kearny's school aid and share of the county tax burden. If the contrary result is reached, then, as in the case of the Congoleum-Kearnyland Inc. transaction, the sale should be used to revise the Kearny ratio.

We find no prejudicial error in either case as to the other grounds of appeal raised.

*For reversal*—Chief Justice WEINTRAUB, and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.