LARIO, J.T.C.
This matter involves an attack by Washington Township in Burlington County upon the table of equalized real property for the tax year 1984 as promulgated by the Burlington County Board of Taxation (county board) as directed by N.J.S.A. 54:3-17 through -19. The township contends that the 80.95% ratio of assessed to true value assigned to it is in error and should be revised upward.
In adopting its final table the board relied upon the formula utilized by the Director, Division of Taxation (director) in computing the October 1, 1983 school-aid ratio[1] for plaintiff. Since *4 plaintiff implemented a municipal-wide reassessment program for the tax year 1984, the “page 8 formula”[2] which incorporated the true value as adjusted, was utilized in computing the county equalization ratio for plaintiff.
In arriving at his one-year true value for real property located within Washington Township as of October 1, 1983, the director relied upon a total of three useable sales all of which fell within class II (residential). Since there were no sales within class I (vacant land) the Director applied his class II ratio thereto.
Plaintiff assigns error in the methodology employed by the county board in two respects: first, that the three sales in question were unduly influenced by the rapidly unfolding transformation of zoning within Washington Township pursuant to the New Jersey Pinelands Comprehensive Management Plan (CMP); and second, that the use of the class II ratio to equalize assessments of class I property produced a grossly inflated and inaccurate equalized valuation for class I because the three sales utilized by the director were improved properties which had substantially increased in value as a result of impending changes in zoning whereas the vacant land sustained a precipitous decline in value owing to the extremely severe restrictions placed upon any future development thereof.
The ratio of assessed value to true value was computed by the director for his October 1, 1983 school-aid ratio on the basis of a sales-ratio study comparing sales of properties, deemed useable, which occurred between July 1, 1982 and June 30, 1983 to the assessments of such properties on a weighted, classified and averaged basis.
*5 In determining which sales should be utilized the director has adopted 27 categories of nonuseable deed transactions. N.J. A.C. 18:12--l.l(a). The three sales in issue were deemed useable by the director and were utilized by him in calculating plaintiff’s class II ratio. Since plaintiff implemented a municipal-wide reassessment program for the tax year 1984 the board applied the page 8 formula in computing the county equalization ratio for Washington Township. The 1984 table for plaintiff reflects an aggregate assessment value of $23,586,600, a ratio of 80.95%, and an aggregate true value of $29,137,245.
The three sales used in developing the ratio which plaintiff claims should have been deemed to be nonuseable were as follows:
(1) Sale-Henry to Walker and Connolly, by deed dated July 15, 1982 for a sale price of $95,000. Assessed value—$27,400.
(2) Sale-Levick to Rumsby by deed dated November 23, 1982 for a sale price of $83,000. Assessed value—$22,500.
(3) Sale-Carney to Jaeckel by deed dated January 14, 1983 for a sale price of $89,500. Assessed value—$28,400
These sales were the only useable sales of property to occur in Washington Township from July 1, 1982 to June 30,1983, the period of time encompassed by the sales ratio study. All three of these properties are located in an area subject to the Pine-lands Protection Act, N.J.S.A. 13:18A-1, et aeq. If these three sales were eliminated, of course, there could be no basis for a sales study. If successful in its complaint plaintiff suggests that either its reassessment aggregates be accepted or that its prior year’s ratio be utilized.
In support of its complaint plaintiff submitted the testimony of the purchasers of two of the properties involved and of its assessor. Each purchaser testified in effect that the Pinelands Protection Act and regulations under CMP had an influence on the respective price that each paid for their homes, each believing that the regulations enhanced the value of the riverfront homes.
Plaintiff further urges that the use of the page 8 formula as utilized by the county board be rejected, arguing that:
*6 [g]iven the unique facts of this case, the massive impact on value brought about by the Pinelands Protection Act, the inability of the assessor to adopt his reassessment program until October 1, 1983 and the absence of any judicial precedent involving similar facts, we believe it is incumbent upon this Court, bearing in mind the goal of fairness and equality in the distribution of the county tax burden, to reject the Page Eight Formula in favor of the reassessment aggregates implemented for the tax year 1984.
Plaintiff’s assessor testified that he conducted a study, the purpose of which was to analyze the impact of CMP upon property within the township. He concluded therefrom that a three-year study of sales within the preservation area (which includes sales in municipalities other than Washington Township) demonstrates that while vacant land declined in value by 54%, riverfront residential properties increased by 154%; non-riverfront properties increased by 55%; and land in the Pine-lands Village districts increased by 92%.
As of the critical assessing date involved in this proceeding, the Pinelands regulations and restrictions were well publicized as is demonstrated by the following history of the development of the area. The Pinelands area is mainly a wooded and essentially undeveloped area located in the south central portion of New Jersey and it includes most of Burlington county. In recent years, New Jersey and the Federal Government have by various methods sought to preserve and protect the environment of that area by adoption of environmental and land development regulations.
In 1972 New Jersey established the Pinelands Environmental Council, N.J.S.A. 13:18-1, et seq. Its express purpose was to protect the water and other natural resources of the area from pollution and destruction. The council in 1975 proposed a plan restricting development but by reason of the controversy created, it was not adopted. On May 24, 1977, Governor Brendon Byrne issued Executive Order No. 56 which established the Pinelands Review Committee whose primary purpose was to study the Pinelands area and to recommend a plan affecting all environmental actions and future development in the area.
On November 10, 1978, 1,000,000 acres of the Pinelands was created as a national preserve by President James Carter, *7 thereby restricting development therein. National Parks and Recreation Act of 1978, § 502, 16 U.S.C.A. 471i et seq. On February 8, 1979 Governor Byrne issued Executive Order No. 71 whereby he established a Pinelands Planning Commission as called for in the federal act for the purpose of preparing a Comprehensive Management Plan (CMP) for the Pinelands. Included in the order was a directive declaring a moratorium on land-use development which established a review procedure to be followed pending the preparation and acceptance of that plan.
On June 28, 1979, the Pinelands Protection Act, N.J.S.A. 13:18A-1, supra, was adopted, thereby giving the land-use development restrictions the effect of state law and creating the Pinelands Commission. N.J.S.A. 13:18A-4. This act was further implemented by the CMP which was submitted by the commission on November 21, 1980 and, after wide-spread publicity, was signed by the Governor on January 14, 1981. N.J. S.A. 13:18A-8. The CMP expanded upon and finalized existing guidelines within the Pinelands area thereby effectively replacing all local master plans and land-use ordinances for municipalities within the Pinelands protection area. For additional details concerning Pinelands development, see Riorano, Inc. v. Weymouth Tp., 4 N.J.Tax 550, 559-561 (Tax Ct.1982); aff'd 6 N.J.Tax 253 (App.Div.1983), certif. den. 96 N.J. 286, 475 A.2d 583 (1984).
The entire township of Washington lies within the Pinelands protection area as designated in the CMP. The CMP establishes eight types of Pinelands Management Areas (PMA), one of which is “Pinelands Villages.” Generally speaking the Pine-lands villages area contains less stringent restrictions on development than most of the other areas.[3]
*8 Although the designation of Pinelands Villages is governed by the CMP, section 5.03(F), the CMP delegates to municipal governing bodies the power to delineate in their zoning ordinances the boundaries of the villages, provided they conform to the criteria set forth in the CMP, section 5.206.
Washington Township alleges that it was not until it adopted its lands development ordinance in July 1983 that its assessor could know the scope of building and development restrictions and their boundaries. By reason thereof, it was the assessor’s position that although he could have increased assessments on some properties located within the core of a Pinelands village, he could not do so with respect to properties on the periphery since those boundaries had not been finalized.
No evidence whatsoever was introduced concerning sale No. 2 to Rumsby; therefore, it is presumed to be a useable transaction. Use of a single sale as the basis for developing a class IV ratio was sustained in Greenwich Tp. v. Gloucester Cty. Bd. of Tax., 47 N.J. 95, 219 A.2d 507 (1966). and Berkeley Hgts. Tp. v. Division of Tax Appeals, 68 N.J.Super. 364, 372, 172 A.2d 453 (App.Div.1961).
In the present case there is no question but that the two remaining sales utilized in the study were also bona fide, arms-length transactions. Neither the two purchasers who testified nor the plaintiff contend that the purchase price for either property was less than its respective market value. Instead plaintiff contends that the assessor was inhibited from recognizing for assessment purposes the increases in value sustained by these properties as a result of well-publicized impending changes in zoning and that the sales failed to establish a comparative relationship between assessed value and sales price, citing Category 24 of the Director’s nonuseable sales list which excludes: “Sales of property the value of which *9 has been materially influenced by zoning changes where the latter are not reflected in currect assessments.” N.J.A.C. 18:12-l(a).
I conclude that the plaintiffs contention on this issue is without merit in that I find that the adoption of the master plan and the land development ordinances had no effect on the sales prices of these three properties involved which were fully developed and inhabited. Although the CMP delegates to the municipal governing bodies the power to delineate in their zoning ordinances the boundaries of Pinelands villages, the villages must conform strictly to the criteria set forth in the CMP. As of the assessing date this criteria was well known throughout the area. The master plan of Washington Township was adopted by its planning board on July 20, 1982, prior to the pertinent assessing date utilized herein in the director’s sales study. The land development ordinance was adopted in July 1983. The ordinance implemented the master plan and neither made significant changes in the permitted land uses within the township as imposed by the CMP. As stated in section 1.22(n) of the ordinance, its intent is “to implement appropriate regulations and standards of the Comprehensive Management Plan.” There is absolutely no proof that the adoption of this ordinance had any affect on the sales in question.
Additionally, two of the sales should not be rejected on plaintiff’s claim that they were influenced by the zoning ordinance because the first sale occurred on July 15, 1982, before the adoption of the Master Plan, and the last sale occurred after the assessment date of October 1, 1982, which was between the adoption of the ordinance and the date of the sale. Plaintiff has failed to establish that the inclusion of the three sales in the sales study was incorrect.
I find that plaintiff’s argument on its second count to be equally unconvincing. I place no weight upon the study presented by plaintiff’s assessor, which was essentially a compilation of resales within the Pinelands area. First, although it is *10 acknowledged that he is a qualified assessor, there is insufficient evidence to establish his qualifications to conduct the type of statistical study which he proposed. Secondly, the study conducted by him was not sufficiently comprehensive nor tested to establish its reliability. The alleged facts relied upon were not within his personal knowledge, nor were they verified. No investigation was made to ascertain whether there were any intervening reasons for the increased and decreased resale prices. I additionally conclude that the results did not necessarily establish the conclusions reached by him since it is possible that the increases and decreases in sales prices for the respective sales used in his study could have been caused by factors other than Pinelands restrictions such as inflated costs of construction and improvements added or destroyed between the date of an original sale and its resale.
Thirdly, and most important, it is not sufficient to merely establish that a different method could have been reasonably utilized. The Legislature has not specified any particular method to be utilized by a county board in arriving at its final county equalization table; any reasonable and efficient method can be used. Willingboro, supra 62 N.J. at 220, 300 A.2d 129; Woodbridge v. Middlesex Cty. Bd. of Tax., 96 N.J.Super. 532, 536, 233 A.2d 650 (App.Div.1967); Perth Amboy v. Middlesex Cty. Bd. of Tax., 91 N.J.Super. 305, 308, 220 A.2d 119 (App.Div.1966), certif. den. 48 N.J. 112, 223 A.2d 491 (1966).
In effecting its responsibility to apportion county taxes among the various taxing districts within the county, the county board must secure to the most feasible limit a fair distribution of the common tax burden. Sayerville Boro. v. Middlesex Cty. Bd. of Tax., 133 N.J.Super. 46, 335 A.2d 75 (App.Div.1975). Exactitude is neither expected nor required, the essential element is that uniformity and equality be applied. Id. at 53, 335 A.2d 75; Berkeley Hgts., supra 68 N.J.Super. 369, 172 A.2d 453.
In arriving at a class ratio our courts have ruled that uniformity can be accomplished with a minimum of discrimination *11 through the use of the director’s sales study technique. Berkeley Hgts., supra at 369, 172 A.2d 453. “This practice has been followed for several years and has proved to be satisfactory,” id. at 369, 172 A.2d 453, and this method of fixing a municipality’s aggregated true value of real estate for school-aid purposes may be utilized by the county board in determining its county tax burden. Passaic City v. Passaic Cty. Bd. of Tax., 18 N.J. 371, 385, 113 A.2d 753 (1955). Where a county board has utilized the director’s school aid table and applied it uniformly a presumption of validity attaches to a county board’s determination in its adoption of an equalization table. Kearney v. Tax Appeals Div., 35 N.J. 299, 305, 173 A.2d 8 (1961). This presumption stands until overcome by sufficient, competent evidence which must be definite, positive and certain in quantity and quality. Perth Amboy, supra 91 N.J.Super. at 309, 220 A.2d 119.
To meet this presumption a municipality attacking an equalization table has the burden of establishing through adequate evidence that the ratio accredited to it is either incorrect or unjust and that there has been imposed on the municipality a substantially excessive share of the county tax burden. Willingboro, supra 62 N.J. at 220, 300 A.2d 129; Kearny, supra 35 N.J. at 304, 173 A.2d 8; Atlantic City v. Atlantic Cty. Bd. of Tax., 2 N.J.Tax 30, 35 (TaxCt.1980), aff’d. 4 N.J.Tax 685 (App.Div.1982), certif. den., 93 N.J. 250, 460 A.2d 659 (1983). Production of evidence tending to illustrate that a municipality would fare better by the use of a different criteria does not meet the burden required of plaintiff. In Woodbridge, supra, the taxing district complained that in promulgating its table the county board by utilizing the unweighted instead of the weighted approach, which was favored by the director, caused Wood-bridge to assume a greater percentage of the county tax burden. In rejecting this claim the court stated: “The mere fact that plaintiff would benefit financially by use of the former [weighted approach] is not enough to proscribe the use of the latter [unweighted approach] method.” Id. at 538, 233 A.2d 650.
*12 In the instant case plaintiff alleged that the assessor was justified in not reassessing the property at an earlier date in that he was not certain as to what effect future zoning laws would have upon values. Plaintiff seems to have overlooked the requirement of N.J.S.A. 54:4-23 which mandates:
The assessor shall ascertain the names of the owners of all real property situate in his taxing district, and after examination and inquiry, determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments. [Emphasis supplied]
However, whether the assessor was justified in not reassessing is not the issue in the present case. The duty of the county board in promulgating a county equalization table is to ascertain what are the true values of the ratables within the municipality as compared to their assessments. Whether the assessor acted reasonably or in good faith in establishing his assessments is immaterial in an equalization proceeding. Berkeley Hgts., supra 68 N.J.Super, at 368, 172 A.2d 453. In promulgating the equalization table the county board must determine “the general ratio of percentage of true value at which the real property of each taxing district is in fact assessed according to the tax lists laid before the board.” N.J.S.A. 54:3-17. The sole criterion is what relationship the total assessments which were in fact levied bear to the total true value of the property within the district.
The claim that the assessor for this taxing district was justifiably unable to correctly appraise the value of the property within his district (even though N.J.S.A. 54:4-23 directs him to use his judgment) is not sufficient basis to set aside the director’s study. As early as 1979 building developers in the area were cognizant of the economic impact that the various regulations had on the land as evidenced by their suit to declare invalid regulations adopted by the Department of Environmental Protection wherein they claimed that the regulations rendered the land within the area useless. N.J. Builders v. Environmental Protection Dept., 169 N.J.Super. 76, 404 A.2d 320 (App.Div.1979). Although the court rejected this argument it *13 admonished assessors “however, if it appears that some subject lands are devalued by the regulations, the tax assessors of the individual towns are to consider the impact of the regulations on the true value of the land.” Id. at 97, 404 A.2d 320.
As of October 1, 1982, it was the assessor’s duty to ascertain the market value of all property within his district. This value is secured in the market place, that is, what willing sellers and willing buyers considered the value to be as evidenced by consumated sales. Obviously the three sellers and buyers of the three sales utilized were able to use their judgment in arriving at their respective market values.
Defendant’s county tax administrator testified that in promulgating the county’s 1983 Equalization Table the board employed the director’s school-aid table; however, for each district which instituted a revaluation or reassessment program, it applied the page 8 formula. For the years in question, 11 districts placed into effect either a revaluation or reassessment program. In each of these districts the page 8 formula was applied. He further stated that since there were no sales of vacant land, he followed the director’s policy of applying to this class the ratio of class II property.[4] The Director’s use of the class II ratio for property in the classes wherein no sales have occurred has been his practice for almost 30 years. In Secaucus v. Taxation Div. Director, Docket # SA 16-73 (Tax App.Div., January 30, 1973), a school aid appeal which was decided by the Division of Tax Appeals, this court’s precursor, it was held that the director’s use in substituting the class II ratio for class IV property was a correct approach. It quoted from the testimony of Samuel Temkin, then Chief, Statistical Section, Local Property Tax Bureau (now Assistant Director, Division of Taxation) as follows:
Q. “Statewide, why is the procedure of imputing the Class II ratio used when there are no Class IV sales?”
*14 A. “This goes back to 1956, ’57 when we found that there were specific categories with no sales. The question arose at that time, just what do you use in that instance. Do you automatically give a district its assessed value and say that’s the full value, or do you apply a category that has the most number of sales and assume that the assessor is assessing all properties at the same level, as closely as possible. In imputing the residential ratio it was found that the residential category-where the most number of sales-in that line of thinking it was determined to use the residential ratio.
This longstanding procedure, which has continued to the present, was recently sustained by Judge Conley of this court in Union Tp. v. Taxation Div. Dir., 176 N.J.Super. 239, 1 N.J.Tax 15, 422 A.2d 803 (Tax Ct.1980).
The page 8 formula was given extensive consideration in Willingboro, supra, and it was concluded that the use of this formula to develop a ratio for revalued districts was a valid way of preventing discrimination and a highly acceptable method. 62 N.J. at 224-225, 300 A.2d 129.
Plaintiffs proofs failed to establish that the use of the page 8 formula was arbitrary, capricious or unreasonable or that its use was error as a matter of law. Woodbridge, supra, 96 N.J.Super. at 537, 233 A.2d 650.
In the present case the county board has treated all taxing districts uniformly and equally. More than 50% of the county is located within the Pinelands area. Eleven of the taxing districts located therein reassessed or revalued for the tax year 1984 and the page 8 formula was applied to each. To grant Washington Township’s prayer to reject the application to it of the page 8 formula in favor of the reassessment aggregates implemented by it for the tax year 1984 would be highly discriminatory and manifestly inequitable to the other ten municipalities which revalued or reassessed; to utilize its prior year’s ratio would be equally discriminatory and inequitable to all other municipalities within the county whose ratio was based on the current year’s assessment and sales data. A county equalization table is intended to control the distribution of the county tax burden. A reduction in the amount paid by a taxing district towards the cost of county government requires that the difference be made up by the remaining districts. To apply *15 a standard to plaintiff different from the other taxing districts would be error as a matter of law.
It is concluded that plaintiff has failed to establish by adequate evidence that the equalization ratio ascribed to it is either erroneous or unjust or that the ratio imposes upon it a substantially excessive share of county taxes. Willingboro, supra, 62 N.J. at 220, 300 A.2d 129; Kearny, supra.
Plaintiffs complaint is dismissed and the 1984 Equalization Table promulgated for Burlington County by the county board is affirmed.

 As required by NJ.S.A. 54:1-35.1 the director annually promulgates for school-aid purposes a table of equalized valuations showing for each taxing district in the State the average ratio of assessment to true value of all its property.
*4 The method employed by the Director in preparing his study has been detailed in Willingboro v. Burlington Cty. Bd. of Tax., 62 N.J. 203, 212, 300 A.2d 129 (1973) and Greenwich Tp. v. Gloucester Cty. Bd. Tax., 47 N.J. 95, 98-99, 219 A.2d 507 (1966).

 For a comprehensive explanation and useability of the page 8 formula see Willingboro v. Burlington Cty. Bd. of Tax., supra at 221-228, 300 A.2d 129.

PMA, Section F provides:
Pinelands Villages and Towns—any use may be authorized in a Pinelands Village or Town if public services to support it are available or can be provided without developing a PAD or Forrest Area and if the character and magnitude of the use is compatible with existing structures and uses.
*8 Residential dwelling units with conventional onsite septic systems must be located on lots of 3.2 acres or more, or 1 acre or more if the unit has an “alternative or innovative” on-site waste system.

 The class II ratio is also applied to the ratables in any other class for which no sales are available for use. New Jersey Division of Taxation, Handbook for New Jersey Assessors, (Rev.1980), § 1002.43 at X-16.