PER CURIAM.
The Township of Pennsville successfully argued before the Tax Court that the Director of the Division of Taxation erred in excluding a January, 1994 real estate sale in Pennsville from the sales ratio study used to develop the October 1, 1994 Table of Equalized Valuations promulgated by the Director pursuant to N.J.S.A. 54:1-35.1. As a result, the Tax Court judge ordered the Director to include the contested sale in compiling the 1994 Table. The Director appeals. We reverse.
The case arose out of the following facts which were established at the trial in the Tax Court. The property at issue is a sixty-two acre parcel made up of a five acre front lot and a 57 acre rear lot. The front lot adjoins the highway. A Ford auto dealership is located on it. The rear lot consists primarily of landlocked wet lands. All the real property (i.e., land and buildings) was owned by Dalessio Motors, Inc.; the personal property of the Ford dealership on the front lot was owned by Dalessio Ford, Inc. John Dalessio was the sole stockholder of both corporations.
In early 1993, Dalessio decided to sell the dealership business, because he was tired of all the pressures from the manufacturer, state and federal governments, the general public, and the employees. He contacted the Ford Dealer Development Program, a division of the Ford Motor Company, which program (among other things) buys Ford dealerships and transfers them to other would-be Ford dealers.
While Dalessio testified that his Ford dealership could have been listed on the open market through an automobile realtor broker, he explained why he had never considered “going out on the open market”:
*50 I chose ... dealing with the company approach through Ford’s Dealer Development Division because I thought it would be easier. I knew there wouldn’t be any surprises at settlement. I knew Ford Motor Company would have the money, the check would be there, and I felt it was a more reliable situation than going out on the open market.
Dalessio testified that “Ford wasn’t really interested in purchasing the real estate at the beginning,” because Ford generally preferred to “lease it rather than tie up their money in it.” However, at Dalessio’s insistence, Ford eventually agreed to purchase both the underlying real estate and the assets in the dealership.
In July, 1993, Dalessio and Ford negotiated on the basis of 1.2 million dollars just for the dealership and the five acres of frontage. However, Dalessio testified that “I called back on that and asked them to give me another hundred thousand [for the] fifty-some acres to the rear, [because] I didn’t want to sit with the real estate, a lot of which was wetlands.” Because Dalessio thought the rear lot had no value separate from the front lot, he “just threw that in to get rid of it.”
In any event, Dalessio testified that this was “how we arrived at the 1.3 million dollar figure” for the real estate. Dalessio testified that thereafter (i.e., after the $1.3 million purchase price for the real estate was “established”) he and Ford negotiated a “completely separate” purchase price of $2,025,000 for the personalty.
In 1990, Delassio had the real property appraised for a divorce proceeding. In 1993, Dalessio based his asking price of $1.3 million on the 1990 appraisal. He testified that he believed the $1.3 million price was fair and that he would be able to sell it if he was willing to “not be too greedy.” The 1990 divorce appraisal was not admitted into evidence; there is no indication that anyone except Dalessio was aware of the 1990 appraisal or its contents.
The parties’ purchase agreement provided for a January, 1994 closing date, and for a post-agreement appraisal of the real estate. Such agreement provided that, if such appraisal indicated that the value of the premises was less than $1,300,000, the buyer had the option to terminate the agreement. This post-agreement appraisal, performed by Norman LeGore, an appraiser secured by the *51 purchaser, valued the real property as being worth at least $1.3 million.
From the outset it was understood by all involved that, while Ford initially negotiated to buy Dalessio’s business, eventually Ford would form a corporation (e.g., Riverview Ford) and assign its right to buy Dalessio’s business to that corporation. This eventually took place, and Riverview Ford-Lincoln Mercury, Inc. ultimately took title to Dalessio’s real and personal property in January, 1994.
Curtis Bunche, the president of Riverview Ford, previously owned a Ford dealership in Pennsylvania. He found out about the opportunity to purchase Dalessio’s dealership via the Ford Dealer Development Program. Thereafter, Bunche participated with Ford in the 1993 negotiations to purchase the real estate and the automobile dealership. Bunche agreed to purchase the assets and separately purchase the real property as well. Bunche felt that $1.3 million was a fair price because he considered $1.3 million to be the fair market value of the real estate. However, Bunche acknowledged at trial (1) that the $1.3 million purchase price in the real estate agreement was set before the LeGore appraisal was done, and (2) that he had agreed to the $1.3 purchase price “[without [his having] physically look[ed] at an appraisal.”
The Division witnesses testified as to why the January, 1994 real estate sale from Dalessio Motors, Inc. to Riverview Ford had been rejected by the Director as a usable sale for inclusion in the sales ratio study. They stated that this sale was not an “open market transaction” because Dalessio’s property was never exposed to any buyer on the open market, except Ford and River-view Ford, which was controlled by Ford. The Director, in looking for usable sales, was only interested in “normal open market real estate transactions.” The Director also rejected the Dalessio property sale because, other than Dalessio’s having an *52 idea of what it was worth based on a 1990 divorce appraisal,[1] there was nothing to indicate why Ford and Bunche had negotiated the $1.3 million purchase price for the real property in 1993.
It was not the Director’s position that sales of a dealership should be considered nonusable in every case. On the contrary, a sale of a dealership could be a usable sale
[I]f, in fact, the land and the building were advertised separately or listed separately with a broker devoid of any inventory, not taking in account good will, the dealership’s name, and that was marketed [as] free-standing real estate and it sold on the open market, it was exposed on the open market for a reasonable amount of time, Ford didn’t buy from Ford, Chevy didn’t buy from Chevy, John Doe bought from Mrs. Smith, they didn’t know each other, they had no relationship prior to the transaction ... [then] we’d have a usable sale.
On January 14, 1994, the real estate was sold by Dalessio Motors to Riverview Ford for $1.3 million. The two sites were assessed at a value of $1,589,500 as of October 1, 1993, for the 1994 reevaluation year. However, Dalessio apparently received the assessment for 1994 after the $1.3 million purchase price was agreed upon in July, 1993.
On appeal, the Director contends that the Tax Court judge erred both in her interpretation of the law and in her application of the facts to the law. In order to evaluate these contentions, it is necessary to understand the statutory scheme.
Pursuant to N.J.S.A. 54:l-35a (generally referred to as the chapter 123 ratio), the Director must promulgate the average ratio for each tax district by using sales of real property in the respective tax district as an indicator of the market value of property. 1530 Owners Corp. v. Borough of Fort Lee, 135 N.J. 394, 396, 640 A.2d 811 (1994). The chapter 123 ratio, derived from the Table of Equalized Valuations, is a computation based on the Director’s study of sales recorded during a one-year sampling period. Id. at 398, 640 A.2d 811. “The Director screens and investigates the various sales of real property to determine which of those sales to use in the study. The standards applied [by the *53 Director] in determining usability are reflected in N.J.A.C. 18:12— 1.1.” Ibid.
N.J.A.C. 18:12-l.l(a) identifies twenty-seven categories of sales which “should generally be excluded” by the Director when computing the chapter 123 ratio. Ibid. See N.J.A.C. 18:12-1.1(b). “The regulation enumerating the twenty-seven nonusable sales categories [N.J.A.C. 18:12-1.1(a) ] is intended as a guide to aid the Director in accomplishing the complex and onerous task of tax equalization.” 1530 Owners, supra, 135 N.J. at 403, 640 A.2d 811. These categories serve as “a shorthand indicator of those sales that are unlikely to have involved arms-length bargaining and therefore are unlikely to have been made at fair market value.” Ibid. See generally Town of Kearny v. Division of Tax Appeals, 35 N.J. 299, 310, 173 A.2d 8 (1961). “The ultimate objective [of the Director] is to determine not whether a sale fits into one of the nonusable categories but whether the sale was an arms-length transaction, reflective of the fair market value of the underlying property.” 1530 Owners, supra, 135 N.J. at 403, 640 A.2d 811. Therefore, the Director may use a transaction in one of the twenty-seven nonusable categories in N.J.A.C. 18:12-1.1(a), only if “‘it clearly appears that the transaction was a sale between a willing buyer, not compelled to buy, and a willing seller, not compelled to sell.’ ” Id. at 398, 640 A.2d 811 (quoting N.J.A.C. 18:12-1.1(b)).[2]
The purpose behind N.J.A.C. 18:12-1.1 is to ascertain true value. N.J.S.A. 54:l-35a(a). See N.J.S.A. 54:1-35.3 (“[t]rue value for purposes of this act shall be deemed to be valuation at current market prices or values determined in such manner as the director may, in his discretion, select”). “True value” has been interpreted *54 by the Supreme Court to be synonymous with “market value.” West Deptford Township v. Gloucester County Bd. of Taxation, 6 N. J.Tax 79, 86 (1983) (citing City of Newark v. Township of West Milford, 9 N.J. 295, 303, 88 A.2d 211 (1952) (true value is the “consideration of the market value of the property at a fair and bona fide sale at private contract”)). See generally State v. Silver, 92 N.J. 507, 514, 457 A.2d 463 (1983) (fair market value of real property is the value that would be assigned to it by “knowledgeable parties freely negotiating for its sale under normal market conditions”); Hackensack Water Co. v. Borough of Old Tappan, 77 N.J. 208, 215, 390 A.2d 122 (1978); Borough of Fort Lee v. Hudson Terrace Apartments, 175 N.J.Super. 221, 226, 417 A.2d 1124 (App.Div.), certif. denied, 85 N.J. 459, 427 A.2d 559 (1980). To be a willing party, each party must be one “who is fully informed of all the facts concerning the subject property,” which facts would include the property’s market value. Gloucester, supra, 6 N. J.Tax at 87. See Kingsley v. Div. of Tax Appeals, 40 N.J. 338, 343-44, 192 A.2d 561 (1963). “To achieve his goal of determining the total true value of real estate within a municipality, the Director eliminates from his sampling all sales which do not reflect market value.” Gloucester, supra, 6 N.J.Tax at 86. See generally 1530 Owners, supra, 135 N.J. at 403, 640 A.2d 811; Township of Willingboro v. Burlington County Bd. of Taxation, 62 N.J. 203, 208-09, 300 A.2d 129 (1973); City of Bayonne v. Division of Tax Appeals, 49 N.J.Super. 230, 233-34, 139 A.2d 424 (App.Div.1958).
Here the Tax Court judge determined that the subject sale “should have been an includable sale for purposes of calculating the table of equalized valuations,” because the “evidence conflrm[ed] that the sales price of 1.3 million dollars was in fact the market price.” The Director counters that the judge’s determination was wide of the mark, in that the focus should be directed toward the circumstances of the sale, and whether they are likely to lead to a market value sale. In other words, he is limited to including “a sale that has either been exposed to market conditions for at least a reasonable period of time to ensure that it has the best chance to reflect current or fair market value or ... has been negotiated by the parties who have knowledge of the fair market value or true value of the property.” The Director chose *55 to exclude the realty transaction here as one not likely to be reflective of the fair market value of the property, because “the sale price was arrived at without exposure to the marketplace or real negotiation by parties who were knowledgeable about the fair market value of the property.”
Indeed, it is undisputed that the subject property was never exposed to the open market. Plaintiff acknowledges that the subject sale was made through the Ford Motor Company network to Bunche, a prequalified candidate under the Ford Dealer Development Division who was seeking to purchase a dealership within the Ford Motor Company network. As the Director properly concluded, Dalessio was not interested in selling the property in the open market, but was more interested in effecting a safe sale of the property in what was essentially a private deal. The circumstances of the subject sale were such as not to lead to a purchase price reflective of the fair market value of the property. We agree with this analysis.
In reaching our conclusion, we note that the Director is vested with wide discretion, and his conclusion is legislatively endowed with a presumption of correctness. See N.J.S.A. 54:51A-4(c) (“assessment ratios as promulgated [by the Director] shall be presumed to be correct, and shall not be revised or modified by the tax court unless the complainant district shall present proof that upon all the evidence available such ratio or ratios could not reasonably be justified”); Kearny Town v. Director, Div. of Taxation, 11 N.J. Tax 282, 235 (1990) (judicial review of the Director’s table of equalized valuations must be in accordance with N.J.S.A. 54:51A-4(e)). See generally Town of Kearny, supra, 35 N.J. at 304, 173 A.2d 8 (“Director is and must be vested with wide discretion in fashioning the table. The statute envelops his work with a presumption of correctness vital enough to sustain it unless ‘upon all the evidence available [the challenged ratio] could not reasonably be justified’ ”); Kingsley v. City of Bayonne, 89 N.J.Super. 549, 555-56, 215 A.2d 769 (App.Div.1965), certif. denied, 47 N.J. 86, 219 A.2d 421 (1966) (a municipality seeking the inclusion of a sale omitted by the Director must show that the Director’s decision to exclude it “could not be reasonably justified”); Union Township v. Director, Div. of Taxation, 176 N.J.Super. 239, 242, 422 A.2d 803 (App.Div.1980) (a municipality seeking *56 the inclusion of a sale omitted by the Director “bears a heavy burden of proof because the Director is vested with wide discretion in fashioning the annual table”).
To be sure, if the trial judge had had de novo responsibility for determining the includability of this sale, her decision might well be sustained on this record. But that is not the case. The primary responsibility for determining the true value of real estate within a municipality is vested in the Director. Given the broad standard of review, it is clear that the Director’s decision to exclude the Dalessio sale can be justified not only on the nature of the transaction but on the fact that none of the parties to the sale was knowledgeable as to the facts involving the property including its market value. Thus, the trial judge overstepped her bounds in reversing his order.
Reversed and remanded to the Director of the Division of Taxation for the reinstatement of the original October 1, 1994 table.

 Presumably for equitable distribution purposes, Dalessio and his divorce lawyer would have sought the lowest possible value to be ascribed to the property in 1990.

 N.J.A.C. 18:12-1.1(a) provides:
(a) The deed transactions of the following categories are not usable in determining assessment — sales ratios pursuant to N.J.S.A. 54:1-35.1 et seq.:
26. Sales which for some reason other than specified in the enumerated categories are not deemed to be a transaction between a willing buyer, not compelled to buy, and a willing seller, not compelled to sell.